**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 250225-U

Order filed February 20, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-25-0225 Circuit No. 22-CM-113 |
| | ) | |
| RICHARD S. GABRYS, JR., | ) ) | Honorable Sherri Hale, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE HETTEL delivered the judgment of the court.
Justices Davenport and Anderson concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The complaint alleging harassment by telephone was legally sufficient, the circuit court did not err when it denied the defendant's motion to suppress a recording of his transport to the police station, the court did not err when it refused the defendant's request to give the jury a non-pattern jury instruction, and the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt.

¶ 2    The defendant, Richard S. Gabrys, Jr., was convicted of two counts of harassment by telephone (720 ILCS 5/26.5-2(a)(2) (West 2020)) and was sentenced to twelve months of court supervision. On appeal, Gabrys argues that (1) the complaint was legally insufficient, (2) the circuit

court erred when it denied his motion to suppress the recording of his transport to the police station and when it allowed the recording into evidence at trial, (3) the court erred when it refused to issue a modified instruction on the elements of harassment by telephone, and (4) the State failed to prove him guilty beyond a reasonable doubt. We affirm.

¶ 3                                I. BACKGROUND

¶ 4        The State charged Gabrys with two counts of harassment by telephone (720 ILCS 5/26.5-2(a)(2) (West 2020)), alleging that Gabrys placed two calls to the Will County State's Attorney's Office—one on September 17, 2021, and one on October 15, 2021—"with the intent to abuse or harass James Glasgow and his receptionists." The State also charged Gabrys with two counts of harassment through electronic communication (*id.* § 26.5-3(a)), alleging that Gabrys placed the calls "with the intent to abuse or harass anyone at the called number."

¶ 5        The trial resulted in the circuit court granting a defense motion for a mistrial. Subsequently, Gabrys filed two motions to dismiss, which the circuit court denied. This court affirmed the circuit court's judgment. *People v. Gabrys*, 2024 IL App (3d) 230363-U.

¶ 6        When the case resumed in the circuit court, Gabrys filed a motion to suppress statements he made while being transported in a squad car to the police station. Gabrys alleged that the transporting officer, Nicholas Giordano, did not inform him of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), before custodially interrogating him in the squad car. After a hearing, the circuit court denied the motion, finding, in essence, that Gabrys was not being interrogated at the time he made his statements.

¶ 7        A jury trial was held in February 2025. Joliet police officer Nicholas Giordano testified that on March 1, 2022, he responded to a call for assistance from the tactical unit. His role was to transport an individual to the police station. Giordano identified Gabrys in-court as the individual

2

he transported that day. He did not know why Gabrys had been arrested. While in the squad car, Gabrys told Giordano that he had been arrested for making calls to the Will County State's Attorney's Office.

¶ 8        A recording of the conversation Giordano had with Gabrys inside the squad car during the ride to the police station was played for the jury and entered into evidence over defense counsel's objection. The video showed a man in handcuffs being placed into the back of a squad car. He screamed "thank you" twice to the officer placing him into the squad car. Next, Giordano identified himself and said he had no idea what was going on and that he was just the driver. The man used profanity casually and often while asking questions and making statements related to having pins and rods in his arm and circulation problems in that arm, asking whether the police could go into his house, and asking whether the arresting officers claimed he was resisting arrest. The man subsequently identified himself as Richard. He also stated, "to say the State's Attorney has a personal vendetta against me is to say water's wet." Giordano asked Richard if there was a warrant for his arrest. Richard said yes, "it's a complaint." Richard further stated, "I was calling the State's Attorney's Off—well, I shouldn't make a statement, but it's p—I don't give a fuck. I'll—I'll admit it. 'Cause it's, you know, it's freedom of speech." He continued:

> "I was calling the State's Attorney's Office and just asking a simple question, how can one attorney be both prosecutor and defense attorney simultaneously. And when the stupid bitch acted like a retard, and said, don't call here, and not give me—and not give me an answer, that means they're compliant—they were just as compliant and prejudiced as the one attorney—as the one attorney was."

¶ 9        Katherine Roemer, whose former last name was Norkus, testified that she was the main clerical receptionist at the Will County State's Attorney's Office in 2021. She and the other

3

receptionist would answer "anywhere from 50 to hundreds of calls throughout the day." In April 2021, she began receiving calls from a person who identified himself as Richard Gabrys. Generally, Roemer described the phone calls as follows:

> "They started out not making sense. It was a gentleman calling and saying – asking what the 6th Amendment was and not really having a purpose. And then he would start to get irate and there was him calling over and over and it was becoming a pattern and constantly trying to figure out in my job as the receptionist was to see how I can help somebody. So it was, okay, what can I help you with. And then the calls just kept coming in and nonstop."

¶ 10    Roemer stated that Gabrys would call from three different phone numbers. She had written those numbers down and noted that the calls should be recorded. Roemer was then asked questions about two of those recorded calls.

¶ 11    The first recorded call was placed on September 17, 2021. The recording was played for the jury and admitted into evidence. The recording began with a male voice loudly saying "good morning" five times. Roemer asked what she could help him with. The male voice said, "why does an attorney, a private attorney have the right to work—blatant sixth amendment prejudice." He began screaming as Roemer told him to stop calling the office. The male voice continued to scream for the next 30 seconds, ending with him screaming, "you ugly fucking bitch." Roemer testified that she recognized the male voice as belonging to Gabrys.

¶ 12    When asked how the call made her feel, Roemer stated,

> "Upset, disturbed because, you know, I don't feel as my job that I'm supposed to take the abuse of somebody screaming and then starting to call me such filthy names in the midst of them being so upset. And there was no purpose. Like, I kept my calm. I stayed

4

focused of trying to, like, make sense of this, but it's very disturbing when you have somebody screaming nonstop in your ear."

¶ 13　　　The second recorded call was placed on October 15, 2021. A male voice calmly asked, "yea, how can a defense attorney be a prosecutor at the same time?" Roemer then asked, "I'm sorry, what can I help you with?" The male voice then repeated a similar question. Roemer then told the male he needed to stop calling the office. The male voice then shouted, "how does a defense attorney become a fucking prosecutor, you ugly fucking cunt?" After repeating her request for the male to stop calling, the male screamed, "you ugly fucking idiotic bitch cunt." Over the next 50 seconds, he repeatedly screamed, "idiot," "bitch," and "cunt." Roemer testified that she recognized the voice as belonging to Gabrys.

¶ 14　　　When asked how the call made her feel, Roemer stated, "[s]cared at that point because he just kept screaming it. And it's not just screaming, but it was making me feel unsafe. Like, okay, if somebody is this angry calling a government building, who's to say that that person isn't just going to come into the building."

¶ 15　　　Roemer further testified that Gabrys also called numerous other times in 2021, including on July 8, 15, and 23; August 6, 11, 12, and 13; September 8 (twice); and October 28. Additionally, Gabrys called in January 2022, identified himself, and asked to speak to an attorney. Roemer asked him which attorney, and Gabrys said any attorney. After being placed on hold, Gabrys hung up and called again. Roemer stated, "that was his pattern. He would call, he would scream and he would call again. It was just a pattern he was constantly doing." Roemer also stated that the calls made her very uneasy and impacted her ability to sleep. She also stated that while she dealt with complaints over the phone as part of her job, she "never had anybody call me derogatory names and screaming on top of it like that."

¶ 16    Jim Long testified that he was an attorney with the Will County State's Attorney's Office. By July 7, 2021, he was aware of the repeated calls made to the office by Gabrys. He stated, "[t]hose calls were outside the norm of any kind of call. They were verbally abusive, using vulgar language, profanity." On or around that date, one of Gabrys's calls was transferred to Long. Long stated that "[t]here really wasn't a conversation" during the call, as Gabrys repeatedly screamed "fuck you" at Long.

¶ 17    Jacqueline Borunda testified that she had been a receptionist at the Will County State's Attorney's Office for the past 17 years. Gabrys began calling the office in April 2021. Borunda stated that, generally, Gabrys would yell and scream, and at times "would just like continuously say F-U, F-U, F-U, and for what reason, I don't know." Borunda stated she found his conduct upsetting and disturbing. She also felt helpless, stating, "[h]ow can you help a person that doesn't even tell you what they are calling regarding."

¶ 18    While Borunda was on the stand, the prosecutor played the recording from Giordano's squad car. Borunda identified the voice on the recording as belonging to Gabrys.

¶ 19    During the jury instructions conference, defense counsel objected to the State's request to give pattern instruction 19.09 on the offense of harassment by telephone (Illinois Pattern Jury Instructions, Criminal, No. 19.09 (approved Dec. 8, 2011) (hereinafter IPI 19.09)). Defense counsel sought to have the instruction modified pursuant to *Counterman v. Colorado*, 600 U.S. 66 (2023), as he claimed that it "supplant[ed]" the pattern instruction. The circuit court rejected defense counsel's request, noting that *Counterman* addressed a Colorado stalking statute.

¶ 20    Defense counsel also moved for a direct verdict, which the circuit court denied. The State then dropped the two charges alleging harassment through electronic communication. Subsequently, the jury returned guilty verdicts on both charges of harassment by telephone. After

his posttrial motion was denied, Gabrys was sentenced to twelve months of court supervision. He appealed.

¶ 21                                   II. ANALYSIS

¶ 22        Gabrys's first argument on appeal is that the complaint was legally insufficient because it merely alleged that he screamed obscenities. Gabrys claims that the complaint did not allege a threat or anything akin to a threat. He also appears to claim that the complaint was legally insufficient on its face because the State failed to allege in the complaint how Gabrys's speech was not protected by the first amendment. The entirety of Gabrys's argument, including the law he cites in support of it, is misplaced.

¶ 23        We review the question of whether a charging instrument was legally sufficient under the *de novo* standard. *People v. Carey*, 2018 IL 121371, ¶ 19.

¶ 24        The United States and Illinois Constitutions both protect an individual's fundamental right to be informed of the nature and cause of the criminal charges levied against him or her. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. The statutory section applicable to a claim that a criminal complaint was legally insufficient is section 111-3(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(a) (West 2020)). See *People v. Meyers*, 158 Ill. 2d 46, 51 (1994) (discussing what is now section 111-3(a)).

¶ 25        Section 111-3(a) requires that a criminal charge

"shall be in writing and allege the commission of an offense by:

(1) stating the name of the offense;

(2) Citing the statutory provision alleged to have been violated;

(3) Setting forth the nature and elements of the offense charged;

(4) Stating the date and county of the offense as definitely as can be done; and

7

"(5) Stating the name of the accused, if known, and if not known, designate the accused by any name or description by which he can be identified with reasonable certainty." 725 ILCS 5/111-3(a) (West 2020).

Section 111-3(a) is "designed to inform the accused of the nature of the offense with which he is charged so that he may prepare a defense and to assure that the charged offense may serve as a bar to subsequent prosecution arising out of the same conduct." *People v. Simmons*, 93 Ill. 2d 94, 99-100 (1982).

¶ 26 Gabrys does not discuss section 111-3(a) or argue that he was not informed of the nature of the offenses such that he was deprived of the ability to prepare a defense. Even if he had done so, his argument would be without merit. A person commits harassment by telephone under section 26.5-2(a)(2) of the Criminal Code of 2012 when he or she uses telephone communication, "whether or not conversation ensues, with intent to abuse, threaten *or* harass any person at the called number." (Emphasis added.) 720 ILCS 5/26.5-2(a)(2) (West 2020). Regarding both phone calls in this case, the criminal complaint's charges (1) named the offense, (2) cited section 26.5-2(a)(2), (3) alleged that Gabrys called the Will County State's Attorney's Office "with the intent to abuse or harass James Glasgow and his receptionists," (4) stated the dates of the calls and the county within which the offenses occurred, and (5) stated Gabrys's name. Under section 111-3(a) of the Code of Criminal Procedure of 1963, Gabrys was sufficiently informed of the nature of the charges filed against him and his ability to present a defense was not impaired. 725 ILCS 5/111-3(a) (West 2020). Accordingly, we hold that the criminal complaint filed in this case was legally sufficient.

¶ 27 To the extent Gabrys challenges the constitutionality of section 26.5-2 as overbroad, we recognize that the same argument was rejected long ago by our supreme court in *People v. Parkins*,

8

77 Ill. 2d 253, 258 (1979) (holding that what is now section 26.5-2 was "neither vague nor overbroad"). We likewise reject Gabrys's argument here.

¶ 28     Gabrys's second argument on appeal is that the circuit court erred when it denied his motion to suppress the recording of his transport to the police station and when it allowed the recording into evidence at trial.

¶ 29     We employ a two-part standard of review to a circuit court's ruling on a motion to suppress. First, we accord "great deference to the trial court's findings of fact and will reverse those findings only if they are against the manifest weight of the evidence." *People v. Cregan*, 2014 IL 113600, ¶ 22. Second, we review the circuit court's ultimate legal ruling on the motion under the *de novo* standard. *Id.*

¶ 30     Police officers must give an individual his or her *Miranda* warnings before conducting a custodial interrogation. *People v. Garza*, 2018 IL App (3d) 170525, ¶ 12. Custodial interrogation occurs when law enforcement officers initiate questioning "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. "An interrogation is any practice that police should know is reasonably likely to evoke an incriminating response from a suspect." *People v. Tayborn*, 2016 IL App (3d) 130594, ¶ 18.

¶ 31     "[S]imple questions seeking clarification of volunteered statements do not require *Miranda* warnings." *People v. Peo*, 391 Ill. App. 3d 815, 821 (2009); see also 2 Wayne R. LaFave *et al.*, Criminal Procedure § 6.7(d) (5th ed. Nov. 2025 update) (advocating for the principle that "the part of the defendant's statement given after the follow-up question is volunteered only if the questions are neutral efforts to clarify what has already been said rather than apparent attempts to expand the scope of the statement previously made").

9

¶ 32    In this case, the recording of Gabrys being transported to the police station showed that his statements were all voluntarily made and were not part of an interrogation. Giordano immediately identified himself and stated he had no idea what had transpired; that he was merely the driver. Gabrys began talking on his own after that. Giordano's comments were essentially confined to saying he had no idea what the situation was and wondering why he was transporting Gabrys. Under these circumstances, we hold that the circuit court did not err when it denied Gabrys's motion to suppress. Likewise, there was no error in allowing the recording into evidence at trial over defense counsel's identical objection.

¶ 33    Gabrys's third argument on appeal is that the circuit court erred when it refused to issue a modified instruction on the elements of harassment by telephone based on the United States Supreme Court's decision in *Counterman*.

¶ 34    "If IPI instructions contain an applicable instruction on a subject about which the trial court determines the jury should be instructed, the trial court *must* use that instruction, unless the court determines that the instruction does not accurately state the law." (Emphasis added.) *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). We review a circuit court's decision on whether to give a nonpattern instruction for an abuse of discretion. *Id.*

¶ 35    In *Counterman*, a male who sent hundreds of Facebook messages to a female was prosecuted under a Colorado statute "making it unlawful to '[r]epeatedly…make[] any form of communication with another person' in 'a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person…to suffer serious emotional distress.' " *Counterman*, 600 U.S. at 70 (quoting Colo. Rev. Stat. § 18-3-602(1)(c) (2022)). Noting that the case involved whether a "true threat" required a defendant's awareness of the threatening nature of his communications (*id.* at 72), the *Counterman* court stated that " '[t]rue threats' of violence

10

\*\*\* are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence' " (*id.* at 74 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). Ultimately, the *Counterman* court held that in "true threat" cases, (1) a subjective standard applied to the defendant's awareness of the threatening nature of his communications (*id.* at 78) and (2) recklessness was the appropriate mental state (*id.* at 78-82).

¶ 36 In this case, the circuit court refused defense counsel's request to give a modified instruction on the elements of harassment by telephone because it found that *Counterman* addressed a Colorado statute on stalking. The circuit court's basis for distinguishing *Counterman* was accurate and persuasive. Moreover, this instant case was not a "true threat" case, as Gabrys was not charged with making a threat of violence. Under these circumstances, we hold that the circuit court did not abuse its discretion when it refused to modify IPI 19.09 as requested by defense counsel.

¶ 37 Gabrys's fourth argument on appeal is that the State failed to prove him guilty beyond a reasonable doubt because: (1) it did not establish that "there was intent to communicate a threat or something akin to a threat" and (2) it did not present records showing the numbers belonged to Gabrys or otherwise identify him as the individual who made the statements in question.

¶ 38 "When a court reviews a challenge to the sufficiency of the evidence, the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is the responsibility of the trier of fact "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. When reviewing a challenge to the sufficiency of the evidence,

11

we "will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *McLaurin*, 2020 IL 124563, ¶ 22. Furthermore, to the extent that Gabrys's argument requires us to perform statutory interpretation, our review is *de novo*. *People v. Muhammad*, 2025 IL 130470, ¶ 35.

¶ 39        In relevant part, "[a] person commits harassment by telephone when he or she uses telephone communication" to "mak[e] a telephone call, whether or not conversation ensues, with intent to abuse, threaten or harass any person at the called number." 720 ILCS 5/26.5-2(a)(2) (West 2020). The criminal complaint in this case alleged that Gabrys acted with the intent to abuse or harass.

¶ 40        The entirety of Gabrys's argument on the intent element is based on *People v. Taylor*, 349 Ill. App. 3d 839 (2004). *Taylor* was decided when the harassment by telephone statute was found at section 1-1 of the Harassing and Obscene Communications Act (720 ILCS 135/1-1 (West 2002) (now 720 ILCS 5/26.5-2)). At that time, the Harassing and Obscene Communications Act (720 ILCS 135/0.01 to 2 (West 2002)) did not contain a definitions section. Thus, because *Taylor* involved the intent to harass, the *Taylor* court looked elsewhere for a definition of harassment. *Taylor*, 349 Ill. App. 3d at 842-45.

¶ 41        The General Assembly repealed the Harassing and Obscene Communications Act in 2013 with Public Act 97-1108 (Pub. Act 97-1108, § 10-5 (eff. Jan. 1, 2013)) and moved its substantive provisions to Article 26.5 of the Criminal Code of 2012. Additionally, the General Assembly added a definitions section that applied to all sections within Article 26.5. *Id.* (adding 720 ILCS 5/26.5-0.1). In relevant part, section 26.5-0.1 included a definition of "harass" and "harassing." 720 ILCS 5/26.5-0.1 (West 2014).

12

¶ 42    "The General Assembly can effectuate any change in statutory construction if it desires so to do." *People v. Casler*, 2020 IL 125117, ¶ 36. Because section 26.5-0.1 now contains a definition of "harass" and "harassing," *Taylor* and any cases that have since followed it are no longer good law in the context of cases brought under Article 26.5 that allege "harassing" or the intent to "harass." For that reason alone, Gabrys's intent-based argument fails.

¶ 43    Moreover, the evidence presented in this case was sufficient to prove the intent element beyond a reasonable doubt. "Harass" and "harassing" in the context of Article 26.5 are now defined as "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances, that would cause a reasonable person emotional distress and does cause emotional distress to another." 720 ILCS 5/26.5-0.1 (West 2022). It is indisputable that Gabrys's screaming of profanity and name-calling (1) was not necessary to any reasonable purpose his calls may have had, (2) would cause a reasonable person emotional distress, and (3) in fact caused emotional distress to Roemer. Under these circumstances, we reject Gabrys's argument that the State failed to prove the intent element beyond a reasonable doubt. See, *e.g.*, *People v. Maggette*, 311 Ill. App. 3d 388, 398 (2000) (holding that intent can be both inferred from the surrounding circumstances and proven by circumstantial evidence).

¶ 44    Finally, we turn to Gabrys's claim that the State failed to prove identity beyond a reasonable doubt. Here, we note that Gabrys does not actually challenge the admissibility of the phone calls underlying the criminal charges, despite his citation to Illinois Supreme Court Rule 901 (eff. Sept. 17, 2019) (addressing the authentication or identification of evidence as a condition precedent to its admissibility); rather, he generally contests the State's proof of identity.

¶ 45    It is the State's burden to prove beyond a reasonable doubt that the defendant was the individual who committed the charged crime. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). "[A]

13

conviction cannot be deemed to be sustained by evidence beyond a reasonable doubt if the identification of the accused was vague, doubtful and uncertain." *People v. Cullotta*, 32 Ill. 2d 502, 504 (1965). "Identification by voice alone may establish a defendant's guilt beyond a reasonable doubt. This manner of identification goes to the weight of the evidence which is to be evaluated by the trier of fact." *People v. Lewis*, 115 Ill. App. 3d 389, 397 (1983) (*rev'd on other grounds*, 103 Ill. 2d 111 (1984)); see also *Ogden v. People*, 134 Ill. 599, 601 (1890) (holding that "[a] witness can learn and know facts by and through the exercise of his perceptive faculties,—his five senses,—and such facts he may state").

¶ 46    Our review of the record reveals that the evidence presented at trial overwhelmingly established that Gabrys was the one who made the two phone calls underlying the two counts of harassment by telephone. Included in this evidence was Giordano's in-court identification of Gabrys as the individual he transported to the police station, Gabrys stating in the recording from the squad car that he called the State's Attorney's office and asked "how can one attorney be both prosecutor and defense attorney simultaneously," and Gabrys calling the receptionist a "stupid bitch" that "acted like a retard" by telling him not to call and not answering his question. Gabrys's own description of the call was substantially identical to the questions asked during the two phone calls which had been recorded and entered into evidence at trial. Moreover, Borunda, who testified she was familiar with Gabrys's voice due to his repeated phone calls to the Will County State's Attorney's Office, identified the voice in the recording from the squad car as belonging to Gabrys. In addition, Roemer testified that she was familiar with Gabrys's voice due to him identifying himself and to his repeated phone calls, and that she recognized the voice in the two phone calls underlying the criminal charges as belonging to Gabrys. Taking this evidence in the light most favorable to the State (*McLaurin*, 2020 IL 124563, ¶ 22), we hold that the voice identifications and

14

other corroborative evidence established beyond a reasonable doubt that Gabrys was the individual who made the two phone calls underlying the criminal charges.

¶ 47                                    III. CONCLUSION

¶ 48        The judgment of the circuit court of Will County is affirmed.

¶ 49        Affirmed.